AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA Karen L. Grigsby)                    19-129

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| CHRISTOPHER ROUGHTON HOGG | ) |
| and | ) |
| RENNIE RODRIGUEZ | ) |
| | ) |
| _Defendant(s)_ | ) |

Case No.   19-1932-M-1,2

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Nov. 2016 through Jan. 2018___ in the county of ___Delaware___ in the

___Eastern___ District of ___Pennsylvania___ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 USC 1349 | Conspiracy to commit wire fraud |
| 18 USC 1343 | Wire fraud |

This criminal complaint is based on these facts:
**See attached affidavit.**

❒ Continued on the attached sheet.

_Complainant's signature_

**Annette Murphy, S.A. FBI**
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __11/18/19__

_Judge's signature_

City and state:           Philadelphia, PA

**Honorable Marilyn Heffley**
_Printed name and title_

## AFFIDAVIT

I, Annette Murphy, being duly sworn, depose and state as follows:

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request an arrest warrant. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since October 2003 and I am currently assigned to the Philadelphia Division, located in Philadelphia, PA. I have been primarily assigned to economic crime squads for most of my career. I have participated in numerous investigations of economic crimes including mail, wire, and securities fraud. I have participated in the execution of numerous arrest and search warrants, subject and witness interviews, and review of bank records.

2.      I submit this Affidavit in support of Arrest Warrants and a Complaint charging CHRISTOPHER ROUGHTON HOGG and RENNIE RODRIGUEZ with conspiracy to commit wire fraud, and wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343. These charges arises from a conspiracy in which HOGG and RODRIGUEZ, aided by others, obtained money under false and fraudulent pretenses from an insurance premium finance company, as described below.

3.      The information in this Affidavit is based upon my personal knowledge and observations as well as information obtained from other law enforcement personnel, and from information obtained from witness interviews, bank and other records, and publicly available information. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge or all of the facts about this matter.

**Insurance Premium Finance Loans**

4.      Generally, the premium finance business involves the provision of financing by a premium finance company to an insured business for the purchase of commercial insurance products. This financing allows the insured to use borrowed funds to pay the insurance premium "up front" to the third-party insurer.

5.      Premium financing is completed in the form of a loan with repayment terms usually ranging from one year to the life of the underlying policy, including principal and interest. Loans are collateralized by the unused redemption value of the insurance policy.

6.      Premium finance loans allow policyholders to manage their cash flow and avoid the high initial out-of-pocket costs associated with expensive commercial insurance products.

7.      Typically, there are four primary parties involved in premium finance loans: the premium finance company, the insured party, an insurance agent to broker the transaction, and the insurance company.

8.      To obtain a premium finance loan, an insurance agent/broker submits documentation to the premium finance company on behalf of the insured. This documentation typically includes information about the underlying insurance policy, as well as background and financial information about the insured. The premium finance company typically subjects this information to an approval and verification process.

9.      After the premium finance company has approved the loan, the premium finance company provides funding for the insurance premium to the insurance agent/broker and notifies the insurance company that the premium has been paid to the agent.

2

10.     Typically, premium finance companies originate premium finance loans that are funded by a bank.

### US Premium Finance and Ameris Bancorp

11.     At all times pertinent to this Affidavit, US Premium Finance ("USPF") was a premium finance company formed by W.V. in Florida in 1993. USPF operated independently from 1993 to June 2001. Between June 2001 and December 2016, USPF operated as a division of various banks. In December 2016, USPF sold a minority interest in its outstanding shares of common stock to Ameris Bancorp. Effective January 1, 2017, USPF operated as a division of Ameris. In January 2018, Ameris Bancorp purchased the remaining outstanding shares of USPF, and USPF became a wholly-owned subsidiary of Ameris Bancorp.

12.     At all times pertinent to this Affidavit, Ameris was a Georgia state-chartered bank that conducts business in the state of Florida with its principal place of business in Duval County, Florida. Ameris Bancorp was the holding company for Ameris. Hereafter, Ameris Bancorp and Ameris will be referred to collectively as "Ameris."

13.     The fraud alleged here arises from the issuance of fraudulent loans, originated by USPF, and funded by Ameris, or in a few instances, another bank.

### Hogg and Rodriguez

14.     At all times pertinent to this Affidavit, HOGG was an Australian citizen and a resident of Pennsylvania, living in the Bryn Mawr area. HOGG was a member of Global IT Sales LLC, a limited liability company registered in Delaware in or about 2014. In or about March 2017, Global IT Sales LLC changed its name to Broad Street Holdings LLC. HOGG was also a

3

key executive with control of the entity BSAM Auto Loans LLC, a limited liability company established in October 2017 in California.

15.     At all times pertinent to this Affidavit, RODRIGUEZ was a resident of Pennsylvania, living in the Broomall area. RODRIGUEZ was a licensed insurance agent. RODRIGUEZ was President of Brandywine Insurance Advisors LLC, a limited liability company formed in or about December 2016 in Delaware. Brandywine Insurance Advisors LLC was located at 2098 West Chester Pike in Broomall, PA. RODRIGUEZ was also President of Agency Bonding Captives, Inc., a corporation formed in or about February 2013 in Delaware.

**The bank accounts**

16.     On or about June 28, 2011, bank account ending #0543 was opened at Wells Fargo Bank in the name of a person identified here as C.S. In or about January 2013, the account was modified to include non-party A.D. Signors on the account were C.S. and non-party A.D. This account is hereafter referred to as "Wells Fargo Bank #0543."

17.     In or about July 2015, bank account ending #8711 was opened at Citizens Bank in the name of Brandywine Insurance Advisors LLC. RODRIGUEZ was a signor on the account. On or about September 5, 2017, authorized signors on the account were updated to include HOGG. This account is hereafter referred to as "Citizens Bank #8711."

18.     On or about January 15, 2016, bank account ending #1203 was opened at Meridian Bank in the name of HOGG and non-party J.H. Signors on the account were HOGG, J.H., and HOGG's employee, N.S. This account is hereafter referred to as "Meridian Bank #1203."

4

19.     On or about March 22, 2016, bank account ending #2935 was opened at Meridian Bank in the name of Global IT Sales LLC. Signors on the account were HOGG, J.H., and N.S. This account is hereafter referred to as "Meridian #2935."

20.     On or about September 15, 2016, bank account ending #2243 was opened at Wells Fargo Bank in the name of NAD Investments LLC. C.S. was the sole authorized signor on the account. This account is hereafter referred to as "Wells Fargo Bank #2243."

21.     On or about October 18, 2017, bank account ending #5833 was opened at TD Bank in the name of Broad Street Holdings. Signors on the account were HOGG, N.S., and non-party S.A. This account is hereafter referred to as "TD Bank #5833."

22.     On or about October 31, 2017, bank account ending #8519 was opened at Wells Fargo Bank in the name of BSAM Auto Loans LLC. Signors on the account were HOGG and non-party M.C. This account is hereafter referred to as "Wells Fargo Bank #8519."

**The fraudulent loans**

23.     In May 2019, law enforcement agents spoke with W.V., the founder and former owner of USPF, who became an employee of Ameris following the sale of USPF to Ameris. W.V. explained that USPF had very clear internal guidelines for the review of loan documents. These included pre-funding verification, in which USPF would request oral verification of the existence of the insurance policy, and post-funding verification, in which USPF reviewers would verify that the funds had been paid to the insurance company providing the policy for which USPF provided the premium financing loan. W.V. told law enforcement agents that an employee had waived the pre- and post-funding verifications for the loans described herein. W.V.

5

identified the employee by name. (As described below, law enforcement later approached the employee and he agreed to cooperate, and is referred to herein as a confidential source ("C.S."))

24.     USPF documentation reviewed by law enforcement agents showed that C.S. had authority to override verification procedures and approve the funding of loans. Specifically, C.S. could approve exceptions to the internal protocols. These exceptions were documented on an "Exception Form" or other internal USPF document. C.S. Law enforcement agents reviewed documentation for many of the loans at issue here, and saw that C.S. had initialed these Exception Forms and documents. Notes on Exception Forms initialed by C.S. included "waive verification" and "waive verbal."

25.     Law enforcement agents approached C.S. in September 2019. Almost immediately, C.S. retained counsel and agreed to provide information to law enforcement agents pursuant to a proffer agreement.[1]  C.S. told law enforcement that sometime in late 2016, HOGG and RODRIGUEZ had approached him about approving loans which would purport to be premium finance loans but for which there would be no insurance. In reality, the loans would be for the use of HOGG, RODRIGUEZ, and in a few instances other individuals. RODRIGUEZ would submit the loans through one of RODRIGUEZ's insurance agencies. HOGG offered to compensate C.S. for approving the loans.

26.     Thereafter, knowing that the insurance premium finance loans originated by RODRIGUEZ and HOGG were fraudulent in that there was no actual insurance policy, CS nonetheless approved the loans and took steps to prevent Ameris from detecting the fraud. For

---

[1]     CS proffered in hope of obtaining a benefit with respect to any potential federal charges that CS may face for the conduct described here, as well as for other conduct that he admitted in his proffer, including criminal tax violations arising from this and unrelated activity.

example, as CS has explained to law enforcement, CS altered the coding in the USPF computer systems to hide the fact that these loans had no insurance. CS also waived various "pre" and "post" funding protocols at USPF that were enacted to protect the company against fraud. CS approved supporting documentation for the loans that in some cases included fake insurance policy binders. In addition, when C.S. knew a USPF employee other than himself was going to be calling the "insurance company" to verify the existence of the policy, C.S. warned HOGG about this upcoming event. HOGG would list his employee N.S. as the contact person for the insurance company. When contacted, N.S. lied and verified the existence and the parameters of the (fictitious) policy.

27.    C.S., who was a resident of Georgia, recalled that in approximately 2017, possibly in the fall, he traveled to Philadelphia, Pennsylvania and met with RODRIGUEZ and HOGG at their offices in the suburbs of Philadelphia. C.S. said the building at which they met had the same address as was listed on USPF paperwork for Brandywine Insurance Advisors. C.S. said that this was the address to which USPF sent notices and documents pertaining to these fraudulent loans, and it was the address to which checks written to Brandywine Insurance Advisors were sent. CS said that Brandywine Insurance Advisors' offices were on one floor of the building, and HOGG and RODRIGUEZ's other businesses, including National Fidelity Insurance, were housed on the two other floors of the three-story building.

28.    C.S. said that, during the meeting, Hogg and Rodriguez introduced C.S. to N.S., one of HOGG's employees. N.S. had printed out an Excel spreadsheet listing all the fraudulent loans that RODRIGUEZ and HOGG had obtained with C.S.'s help. HOGG, RODRIGUEZ, N.S. and C.S. discussed those loans.

7

29.     From its review of bank records and loan documents as well from C.S.'s admissions, law enforcement has determined that in total, between at least November 2016 and January 2018, C.S. approved approximately 37 premium finance loans, or loan supplements, originated by insurance agencies controlled by RODRIGUEZ, purportedly to purchase policies to insure entities owned or controlled by HOGG and/or RODRIGUEZ, or in a few instances controlled by other individuals. These loans were purportedly for the purpose of financing premiums allegedly to be paid by the entities for insurance premiums. However, as HOGG, RODRIGUEZ, and C.S. knew, there were no underlying insurance policies, and HOGG and RODRIGUEZ used the proceeds for other purposes. The loans totaled approximately $21,357,645.

30.     Bank records show that, after C.S. approved the loans, Ameris (or in some cases USPF or another bank) transmitted, or caused to be transmitted, via wire or other bank transfer, the loan proceeds to accounts in the names of insurance agencies owned or controlled by RODRIGUEZ.

31.     Bank records show that, instead of paying insurance premiums (because there were no insurance policies that needed paying), RODRIGUEZ kept some of the proceeds for himself and distributed most of the other proceeds to bank accounts controlled by HOGG, or in a few instances to other individuals/entities.

32.     Bank records also show that RODRIGUEZ and HOGG used some of the proceeds from newer loans to make loan payments to USPF/Ameris on older loans. Had loan payments not been made on at least some loans, USPF/Ameris could have become suspicious.

8

33.     Additionally, bank records show that between approximately October 2016 and December 2017, HOGG made approximately 40 payments to C.S. totaling $873,118.00. C.S. admitted to law enforcement that these payments were made because he approved the fraudulent loans.

34.     By their false statements and material omissions, HOGG and RODRIGUEZ received approximately $21 million from USPF. They made approximately $6.5 million in loan payments to USPF, resulting in a net loss of approximately $15 million.

**Wire transfers**

35.     The conduct described above involved dozens of wire transfers of funds in furtherance of the fraud scheme. Bank records show the following interstate transactions, among others:

36.     On or about April 28, 2017, loan proceeds of $382,075.00 were sent via wire transfer from Ameris in Georgia to Citizens Bank #8711, an account controlled by RODRIGUEZ in Pennsylvania. The Premium Finance Agreement and Disclosure Statement submitted to USPF in connection with these proceeds listed the Producer (Agent/Broker) as Brandywine Insurance Advisors, LLC with a place of business listed as 6 Berkeley Road, Devon, Pennsylvania.

37.     On or about May 1, 2017, RODRIGUEZ sent or caused to be sent via wire transfer the sum of $382,075.00 from Citizens Bank #8711, an account he controlled, to Meridian Bank #2935, an account controlled by HOGG.

38.     On or about May 8, 2017, HOGG sent or caused to be sent check #351 in the amount of $10,000.00 drawn on Meridian Bank #1203, an account he controlled, to C.S. The check was deposited into Wells Fargo Bank #2243, an account controlled by C.S.

9

39.     On or about August 23, 2017, loan proceeds of $710,175.00 were sent via wire transfer from Ameris in Georgia to Citizens Bank #8711, an account controlled by RODRIGUEZ. The Premium Finance Agreement and Disclosure Statement submitted to USPF listed the Producer (Agent/Broker) as Agency Bonding Captives, Inc., with a place of business listed as 2098 West Chester Pike, Suite 101, Broomall, Pennsylvania.

40.     On or about August 24, 2017, RODRIGUEZ sent or caused to be sent via wire transfer the sum of $710,175.00 from Citizens Bank #8711, an account he controlled, to Meridian Bank #1203, an account controlled by HOGG.

41.     On or about August 28, 2017, HOGG sent or caused to be sent check #121 in the amount of $30,000 drawn on Meridian Bank #1203, an account he controlled, to C.S. The check was deposited into Wells Fargo Bank #2243, an account controlled by C.S.

42.     On or about October 13, 2017, loan proceeds of $317,591.45 were sent via wire transfer from Ameris in Georgia to Citizens Bank #8711, an account controlled by RODRIGUEZ and HOGG.

43.     On or about October 16, 2017, RODRIGUEZ sent or caused to be sent via wire transfer the sum of $317,591.45 from Citizens Bank #0459, an account he controlled, to Meridian Bank #2935, an account controlled by HOGG.

44.     On or about October 18, 2017, HOGG signed a withdrawal slip from Citizens #8711, an account controlled by HOGG and RODRIGUEZ, in the amount of $317,591.00 and deposited that amount into Citizens #0459, an account controlled by RODRIGUEZ. HOGG conducted this transaction in person at Citizens Bank "Manoa" branch #060520, which was located in Havertown, Pennsylvania.

10

45.     On or about November 2, 2017, loan proceeds of $600,100.00 were sent via wire transfer from Ameris in Georgia to Citizens Bank #8711, an account controlled by RODRIGUEZ and HOGG. The Premium Finance Agreement and Disclosure Statement submitted to USPF listed the Producer (Agent/Broker) as Brandywine Insurance Advisors, LLC with a place of business listed as 6 Berkeley Road, Devon, Pennsylvania.

46.     On or about November 3, 2017, HOGG sent or caused to be sent a wire in the amount of $30,000 from Meridian Bank #1203, an account he controlled, to Wells Fargo Bank #0543, an account controlled by C.S.

47.     On or about December 7, 2017, HOGG sent or caused to be sent a wire transfer in the amount of $25,000 from Wells Fargo Bank #8519, an account he controlled, to Wells Fargo Bank #0543, an account controlled by C.S.

48.     On or about December 22, 2017, loan proceeds of $429,675.00 were sent via wire transfer from Ameris in Georgia to Citizens Bank #8711, an account controlled by HOGG. The Premium Finance Agreement and Disclosure Statement submitted to USPF listed the Producer (Agent/Broker) as Brandywine Insurance Advisors, LLC with a place of business listed as 6 Berkeley Road, Devon, Pennsylvania.

49.     On or about December 26, 2017, HOGG sent or caused to be sent a wire transfer in the amount of $40,000.00 from TD Bank #5833, an account he controlled, to Wells Fargo Bank #0543, an account controlled by C.S.

50.     During the time described above, Citizens Bank processed wire transfers from its location in East Providence, Rhode Island, were its network and servers were located.

11

51.   Based on the foregoing, there is probable cause to believe that from in or about November 2016 to or about January 2018, CHRISTOPHER ROUGHTON HOGG and RENNIE RODRIGUEZ conspired to commit wire fraud, and wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343.

_____
Annette Murphy
Special Agent
Federal Bureau of Investigation

Sworn and Subscribed before me
this ____ of November, 2019

HONORABLE MARILYN HEFFLEY
*United States Magistrate Judge*

12